

**FILED**

APR 1 9 2023

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. _23-088-02 (CJN)_ |
| | : | |
| v. | : | VIOLATION: 50 U.S.C. § 1705 |
| | : | (Conspiracy to Violate IEEPA) |
| | : | |
| | : | 31 C.F.R. Part 560 (Iranian |
| | : | Transactions and Sanctions |
| | : | Regulations) |
| | : | |
| EMPIRE NAVIGATION INC. | : | |
| SUEZ RAJAN LIMITED | : | |
| | : | FORFEITURE: |
| Defendants. | : | 18 U.S.C. § 981(a)(1)(G) and |
| | : | 21 U.S.C. § 853(p) |

### STATEMENT OF OFFENSE

This Factual Statement is made pursuant to, and is part of, the Plea Agreement dated March 16, 2023, between the United States Attorney's Office for the District of Columbia, the United States Department of Justice, National Security Division (collectively, "DOJ") and Suez Rajan Limited (the "Plea Agreement"). This Factual Statement is also made pursuant to, and is part of, the Deferred Prosecution Agreement dated March 16, 2023, between DOJ and Empire Navigation Inc. (the "Deferred Prosecution Agreement") Defendants Empire Navigation Inc. ("Empire") and Suez Rajan Limited hereby stipulate and will not dispute that the following information is true and accurate. Defendants Empire Navigation Inc. and Suez Rajan Limited admit, accept, and acknowledge that they are responsible for the acts of their officers, directors, employees, and agents as set forth below. The following facts establish beyond a reasonable doubt the charge set forth in the criminal Information attached to the Plea Agreement and the Deferred Prosecution Agreement. All conduct discussed in this Statement of Offense occurred on or about the dates described.

## Applicable Law

*United States Sanctions Against Iran*

1.      The International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1701, *et seq.*, granted the President of the United States the authority to deal with unusual and extraordinary threats to the national security, foreign policy, and economy of the United States. Pursuant to that authority, the President could declare a national emergency through Executive Orders that had the full force and effect of law. Among other things, IEEPA empowered the President to impose economic sanctions on a foreign country.

2.      On March 15, 1995, the President issued Executive Order 12,957, which found that the actions and policies of the government of Iran constituted an unusual and extraordinary threat and declared a national emergency under IEEPA to deal with that threat. 60 Fed. Reg. 14,615 (Mar. 17, 1995). In two subsequent Executive Orders in 1995 and 1997, the President imposed comprehensive sanctions on Iran and clarified the original declaration of a national emergency. Exec. Order No. 13,059, 62 Fed. Reg. 44,531 (Aug. 21, 1997); Exec. Order No. 12,959, 60 Fed. Reg. 24,757 (May 9, 1995). Since 1997, the President has continued the national emergency with respect to Iran and the 1995 and 1997 Executive Orders.

3.      To implement the sanctions, the Secretary of the Treasury, through the Office of Foreign Assets Control ("OFAC"), promulgated the Iranian Transactions Regulations, 31 C.F.R. Part 560, which were renamed the Iranian Transactions and Sanctions Regulations (ITSR) in 2013.

## Entities

*Government of Iran*

4.      On January 19, 1984, the United States designated Iran as a state sponsor of terrorism. *See* https://www.state.gov/reports/country-reports-on-terrorism-2020/iran/ (last visited

March 14, 2023). The State Department found that "Iran used the Islamic Revolutionary Guard Corps – Qods Force (IRGC-QF) to provide support to terrorist organizations, provide cover for associated covert operations, and create instability in the region," and that "the IRGC-QF is Iran's primary mechanism for cultivating and supporting terrorist activity abroad." *Id.* To date, the United States has not delisted Iran as a state sponsor of terrorism. *See* https://www.state.gov/state-sponsors-of-terrorism/ (last visited March 14, 2023).

*Iranian Ministry of Petroleum*

5.     According to the Iranian Ministry of Petroleum's website, the ministry "is a state-run organ affiliated with the Executive branch of government" that was established in 1979. https://en.mop.ir/home/ (last checked March 14, 2023). The ministry reports that it is "tasked with exercising the principle of Iran's ownership of and national sovereignty over oil and gas resources as well as separating governance from administrative tasks in the development of oil and gas industry." *Id.* The ministry exercises its authority over the petroleum industry through four subsidiaries, the National Iranian Gas Company, the National Iranian Oil Refining and Distribution Company, and the National Petrochemical Company. *Id.* "Through subsidiaries, the Ministry supervises exploration, extraction, marketing and selling of crude oil, natural gas and petroleum products in the country." *Id.*

6.     On October 26, 2020, OFAC designated the Iranian Ministry of Petroleum under Executive Order 13,224 for providing financial support to the Islamic Revolutionary Guard Corps – Quds Force ("IRGC-QF"). *See* https://home.treasury.gov/news/press-releases/sm1165 (last visited March 14, 2023). OFAC found that "[t]he Iranian Ministry of Petroleum has been used by individuals at the highest levels of the Iranian regime to facilitate the IRGC-QF's revenue generation scheme." *Id.*

*Islamic Revolutionary Guard Corps*

7.      The IRGC is a branch of the Iranian armed forces whose purpose is to defend the country's political system. The IRGC-QF is a branch of the IRGC that specializes in unconventional warfare and military intelligence operations.

8.      The IRGC and IRGC-QF use a network of shipping companies and front companies to hide their involvement in the sale and shipment of Iranian oil. Specifically, OFAC has found that the IRGC-QF uses a "complex network of intermediaries … to obfuscate its involvement in selling Iranian oil." https://home.treasury.gov/news/press-releases/sm767 (last visited March 14, 2023); *see also* https://home.treasury.gov/news/press-releases/tg1718 ("The IRGC, long a target of U.S. sanctions, has a history of attempting to circumvent sanctions by maintaining a complex network of front companies."). The Secretary of the Treasury has previously found that holding groups and companies in the petrochemical sector and elsewhere "provide financial lifelines to the IRGC." https://home.treasury.gov/news/press-releases/sm703 (last visited March 14, 2023).

9.      The IRGC generates substantial revenues from the sale of petroleum products. For example, OFAC has reported that "[i]n spring 2019 alone, this IRGC-QF-led network employed more than a dozen vessels to transport nearly 10 million barrels of crude oil, predominantly to the Syrian regime. These shipments, taken collectively, sold for more than half a billion dollars. The same network also sold nearly four million barrels of condensate and hundreds of thousands of barrels      [of]      gas      oil,      bringing      in      another      quarter      billion      dollars." https://home.treasury.gov/news/press-releases/sm767 (last visited Mach 14, 2023).

10.      On October 25, 2007, OFAC designated the IRGC-QF under Executive Order 13,224, which is "aimed at freezing the assets of terrorists and their supporters." *See* https://2001-2009.state.gov/r/pa/prs/ps/2007/oct/94193.htm (last checked March 14, 2023). On October 13,

2017, OFAC designated the IRGC pursuant to Executive Order 13,224 for providing material support, including training, personnel, and military equipment, to the IRGC-QF. *See* https://home.treasury.gov/news/press-releases/sm0177 (last visited March 14, 2023).

11.     On April 8, 2019, the President announced that he would designate the IRGC, including the IRGC-QF, as a Foreign Terrorist Organization under Section 219 of the Immigration and Nationality Act ("INA") (8 U.S.C. § 1189). *See* https://ir.usembassy.gov/statement-from-the-president-on-the-designation-of-the-islamic-revolutionary-guard-corps-as-a-foreign-terrorist-organization/ (last visited March 14, 2023). On April 8, 2019, the State Department similarly announced the pending designation of the IRGC, including the IRGC-QF. *See* https://2017-2021.state.gov/designation-of-the-islamic-revolutionary-guard-corps/index.html (last visited March 14, 2023). On April 15, 2019, the Secretary of State published a notice in the Federal Register that he had designated the IRGC, including the IRGC-QF, as a Foreign Terrorist Organization under Section 219 of the INA. *See* 84 Fed. Reg. 15,278 (Apr. 15, 2019), https://www.federalregister.gov/documents/2019/04/15/2019-07415/in-the-matter-of-the-designation-of-the-islamic-revolutionary-guard-corps-and-other-aliases-as-a (last visited March 14, 2023).

*National Iranian Oil Company*

12.     NIOC is the national oil company of Iran and a subsidiary of the Iranian Ministry of Oil. NIOC describes itself as "one of the largest oil firms in the world with huge hydrocarbon reserves." https://en.nioc.ir/portal/home/?generaltext/81026/81171/67776/ (last visited March 14, 2023). NIOC reports that it is "responsible for organizing and policy-making activities of the oil industry, including exploration, drilling, production, research and development, as well as oil and gas exports." *Id.*; *see also* https://home.treasury.gov/news/press-releases/sm1165 ("NIOC,

overseen by the Ministry of Petroleum, is responsible for the exploration, production, refining, and export of oil and petroleum products in Iran.") (Last visited March 14, 2023). According to OFAC, the distribution of NIOC oil "helps to finance Iran's Islamic Revolutionary Guard Corps-Qods Force (IRGC-QF) and its terrorist proxies." https://home.treasury.gov/news/press-releases/sm885. (Last visited March 14, 2023).

13.     On September 24, 2012, the Department of the Treasury reported to Congress that it had determined that NIOC was an agent or affiliate of the IRGC. *See* https://home.treasury.gov/news/press-releases/tg1718 (March 14, 2023). On October 26, 2020, OFAC designated NIOC pursuant to Executive Order 13,224 "for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services in support of, the IRGC-QF." *See* https://home.treasury.gov/news/press-releases/sm1165 (March 14, 2023).

*Iranian Oil Terminals Company*

14.     The Iranian Oil Terminals Company ("IOTC") is a subsidiary of NIOC that operates the Kharg Oil Terminal at Kharg Island, Iran. *See* https://en.nioc.ir/en-US/en.nioc/5699/page/Subsidiaries (listing IOTC as a subsidiary) (last visited March 14, 2023); *see also* https://www.iotco.ir/en/aboutus/introductioncompany (stating that IOTC is "one of the companies under [the] umbrella of [the] National Iranian Oil Company") (last visited March 14, 2023). IOTC describes itself as "an operational, specialized and professional organization that has the duty of all reservation affairs, crude oil, oil products, liquefied gas and marine services export and import operations along with providing measurement and lab services." *Id.* According to IOTC, its responsibilities include "support and sustained continuation of oil and gas production in the country in four operational zones of Kharg Oil Terminals" *Id.* According to Orbis, a corporate

reporting service, the government of Iran is the "global ultimate owner" of IOTC.

*Kharg Oil Terminal*

15.     Kharg Oil Terminal is an oil terminal located at Kharg Island, Iran that is operated by IOTC. The terminal has quays or jetties for loading petroleum onto crude oil tankers. *See* https://www.iotco.ir/en/oilterminals/kharg (last visited March 14, 2023).

16.     According to IOTC's website, Kharg Oil Terminal receives oil via pipeline from Iran's South Oilfields, which are operated by the National Iranian South Oil Company ("NISOC"). *See id.*

*National Iranian South Oil Company*

17.     According to NISOC's LinkedIn page, "National Iranian South Oil Company (NISOC) … is a government-owned corporation under the direction of the Ministry of Petroleum of Iran and operates as a subsidiary of National Iranian Oil Company." *See also* https://en.nioc.ir/en-US/en.nioc/5699/page/Subsidiaries (listing NISOC as a subsidiary of NIOC) (Last visited March 14, 2023).

*SUEZ RAJAN*

18.     Company A owns the M/T SUEZ RAJAN (International Maritime Organization ("IMO") No. 9524475) ("SUEZ RAJAN"), a crude oil tanker that is registered in the Marshall Islands.



*Satellite image of the Suez Rajan captured on May 17, 2022 by the European Space Agency*

*Suez Rajan Limited*

19.     Suez Rajan Limited is a Marshall Islands company. At all relevant times, it was the bareboat charterer of the SUEZ RAJAN.

*Empire*

20.     Empire is a Marshall Island company with a branch that operates in Greece and that, *inter alia*, manages and operates oil tankers. At all relevant times, Empire operated the SUEZ RAJAN pursuant to a management agreement with Suez Rajan Limited.

**The SUEZ RAJAN's Transport of Iranian Oil**

*The VIRGO Loaded Iranian Oil at the Kharg Oil Terminal.*

21.     On or around January 14, 2022, the M/T VIRGO (IMO No. 9236250) ("VIRGO") entered the Persian Gulf from the Gulf of Oman. The VIRGO headed to a point west of Kharg

Island, Iran while specifying over its Automatic Identification System ("AIS")[1] that its destination was "FOR ORDERS," without identifying a port or other destination.

22.     While in the Persian Gulf, the VIRGO began using a secondary AIS transponder to broadcast a false location. Specifically, on January 17, 2022, at approximately 7:31 UTC, the VIRGO reported via AIS that its position was 29.3996° N, 49.46673° E (Persian Gulf, west of Kharg Island, Iran). Satellite imagery from the European Space Agency ("ESA") reflects that the VIRGO was not present at that reported location at that date and time.



*Jan. 17, 2022: ESA satellite imagery reflects that the VIRGO was not present at its AIS reported position.*

23.     In fact, on or around January 17, 2022, ESA satellite imagery captured the VIRGO at berth 11 of the Azarpad at the Kharg Oil Terminal. The Azarpad, which is also known as the

---

[1]     AIS is a vessel tracking system that uses transceivers on ships to identify their positions, courses, and speeds, among other information.

Western Jetty, is a quay located approximately 1455 meters off the western coast of Kharg Island that can service vessels of up to 500,000 tons for loading petroleum. *See* https://www.iotco.ir/en/oilterminals/kharg (last visited March 14, 2023).



*Jan. 17, 2022: ESA satellite image of VIRGO at berth 11 of the Azarpad, Kharg Oil Terminal*

24.     On or around the evening of January 17, 2022, after loading the Iranian oil, the VIRGO departed Kharg Island and resumed its regular AIS transmission. The VIRGO's AIS transmissions now reported a draft depth of 20.5 meters, indicating that the vessel was fully laden. The VIRGO was empty before it berthed at the Kharg Oil Terminal and fully laden thereafter.

25.     According to AIS data, the VIRGO subsequently departed the Middle East region via the Gulf of Oman and headed down the Arabian Sea, passing the south coast of Sri Lanka towards the Strait of Malacca. On or around January 30, 2022, while transiting the Strait of Malacca, the VIRGO broadcasted over AIS at 09:01 UTC that its reported destination was the "FAR EAST," without specifying further details regarding a port or country. On or around January 31, 2022, the VIRGO entered the South China Sea.



*Path of the VIRGO, as reported by AIS, as it traveled from the Persian Gulf to the Strait of Malacca*

### Company B Chartered the SUEZ RAJAN to Carry Cargo to China

26.     On or around February 3, 2022, Company B entered into a time charter agreement with Suez Rajan Limited to charter the SUEZ RAJAN. Company B sent two wire transfers denominated in U.S. dollars to Suez Rajan Limited to pay for SUEZ RAJAN chartering fees. Specifically, as part of the transaction involving the ship-to-ship transfer ("STS") described below, Company B sent Empire Navigation a wire transfers of $712,500 on February 11, 2022, and $516,233.95 on February 16, 2022.

### The SUEZ RAJAN Engaged in an STS Transfer with the CS BRILLIANCE

27.     On or about January 18, 2022, the SUEZ RAJAN sailed from Dalian, China to Singapore East Outside Port Limits (EOPL). At this time, the vessel was empty. The SUEZ RAJAN arrived in Singapore on February 2, 2022. At this time, as noted, the bareboat charterer for the vessel was Suez Rajan Limited and the vessel was being operated by Empire.

28.     On February 4, 2022, an individual at Company B directed the captain of the SUEZ RAJAN, who worked at Empire's direction, to STS with the CS BRILLIANCE (IMO No.

11

9153513) ("BRILLIANCE") and another unnamed vessel.

29.     The voyage instructions that the individual at Company B sent to the captain of the SUEZ RAJAN on February 4, 2022 identified Company B as the "ACCOUNT" and directed the SUEZ RAJAN to conduct a loading operation of "4,000 [barrels] + / - 10%," with the BRILLIANCE at the Tanjung Pelepas Port in Malaysia on or about February 4 or 5, 2022, and then another loading operation of "1,100,000 [barrels] +/-10% (UP TO [VESSEL] MAX CAPACITY ON SAFE DRAFT)" at the EOPL anchorage off Singapore on or about February 5 or 6, 2022. The instructions did not identify the vessel for the second loading operation other than the notation "STS." The voyage instructions provided for the carriage of the crude oil to "CHINA FOR ORDER."

30.     Prior to the loading of the SUEZ RAJAN from the BRILLIANCE, Person A, an employee of Empire, contacted the captain of the SUEZ RAJAN and informed him that the two different cargoes loaded from BRILLIANCE and the VIRGO would be declared as one loading operation. Person A directed that the sum of both STS quantities (i.e., oil loaded from the BRILLIANCE and VIRGO) would be reported on the vessel deck logbook and oil record book, as well as all other documents, as one single STS loading operation from the BRILLIANCE. Person A informed the captain of the SUEZ RAJAN that the total quantity of oil to be reported as loaded from the BRILLIANCE was approximately one million barrels. The captain of the SUEZ RAJAN informed Person A that it was important to accurately report both STS operations, but Person A stated this was the agreement between Company B and Empire.

31.     On or about February 6, 2022, the SUEZ RAJAN engaged in an STS transfer with the BRILLIANCE, as directed by Company B, in which the SUEZ RAJAN took on approximately 4,000 barrels of crude oil.

12

32.     AIS data reflect that the SUEZ RAJAN engaged in the STS transfer with the BRILLIANCE between approximately 13:36 UTC on February 5, 2022, and approximately 3:58 UTC on February 6, 2022, a duration of just over 14 hours. The transfer took place in the anchorage of Tanjung Pelepas, Malaysia, directly west of Singapore.

33.     On or around February 5, 2022, at approximately 22:15 UTC, the SUEZ RAJAN reported a new draft depth of 16.8 meters via AIS. Per Person A's instruction to the captain of the SUEZ RAJAN, on or around February 5, 2022, at approximately 22:53 UTC, the SUEZ RAJAN updated its draft depth to 16.5 meters on AIS. The captain of the SUEZ RAJAN informed Person A that manipulating the AIS to change the draft could raise questions with authorities in the Singapore Straight, or individuals aboard the BRILLIANCE. But Person A told him that Empire had done this in the past, and if the captain had any concerns, he could call the captains of other vessels for clarification on how Empire has done this activity in the past.

34.     The SUEZ RAJAN's reported draft depth following the STS transfer would make it appear that the vessel had accepted approximately 1,063,000 barrels. However, due to the relatively short amount of time spent together, little if any cargo was actually transferred and the engagement was simply a ruse so the SUEZ RAJAN would appear fully laden.

35.     The SUEZ RAJAN's vessel log contains a crossed-out entry dated February 6, 2022. The crossed-out entry indicates that that the SUEZ RAJAN engaged in an STS transfer with the BRILLIANCE at Tanjung Pelepas, Malaysia and took on approximately 979,935 barrels of crude oil.

36.     The SUEZ RAJAN's vessel log then bears a second entry dated February 6, 2022, that was not crossed-out. This new entry indicates the SUEZ RAJAN engaged in an STS transfer with the BRILLIANCE at Tanjung Pelepas, Malaysia but took on just approximately 3,931 barrels

of crude oil.

37.     The captain and chief officer (who also worked at the direction of Empire) of the SUEZ RAJAN made these falsified records at the instruction of Person A.

38.     On or around February 6, 2022, the captain of the SUEZ RAJAN issued multiple letters of protest in connection with the STS transfer with the BRILLIANCE. One of the letters of protest indicates that the SUEZ RAJAN received just approximately 3,914 barrels of oil rather than approximately 3,919 barrels of oil, as reported by the BRILLIANCE. Another protest letter indicates that the BRILLIANCE failed to issue a certificate of quality, a certificate of quantity, and a certificate of origin to the SUEZ RAJAN in connection with the STS transfer.

*The VIRGO Transferred the Iranian Crude Oil to the SUEZ RAJAN*

39.     On or about February 13, 2022, the SUEZ RAJAN engaged an STS with the VIRGO near the EOPL anchorage off Singapore. The VIRGO transferred 976,483 barrels of crude oil to the SUEZ RAJAN during the STS.



*Satellite imagery of SUEZ RAJAN engaged in an STS with VIRGO on February 13, 2022*

40.     Vessel logs from the SUEZ RAJAN corroborate the satellite images of the STS with the VIRGO. Specifically, one vessel log indicates that the SUEZ RAJAN and VIRGO commenced mooring in the Singapore EOPL on February 12, 2022, and that an STS was in progress between the two vessels on February 13, 2022. A second vessel log indicates that the SUEZ RAJAN completed loading approximately 975,989 barrels of crude oil in an STS transfer with the VIRGO on February 14, 2022.

41.     On February 14, 2022, the captain of the SUEZ RAJAN sent an email to numerous Company B and Empire email addresses, attaching records relating to the STS transfer with the VIRGO. Among the records that the captain forwarded was an activity log entitled "Statement of Fact-Loading," which documented that the SUEZ RAJAN moored with the VIRGO and commenced loading on February 12, 2022, and completed loading on February 14, 2022.

42.     On February 14, 2022, the captain of the SUEZ RAJAN issued multiple letters of protest in connection with the STS transfer with the VIRGO. Among those letters of protest was a "letter of protest for short loading," which indicates that the SUEZ RAJAN only received 976,483 barrels of crude oil when VIRGO was supposed to deliver 1,100,000 barrels of crude oil, plus or minus 10 percent.

43.     During the STS transfer with the VIRGO, the SUEZ RAJAN appears to have continued reporting its true location via AIS. The VIRGO, however, reported a location that was approximately eight miles away from the SUEZ RAJAN. For example, on or around February 12, 2022, at approximately 03:16 UTC, the VIRGO reported via AIS that it was located at 1.791172° N, 104.7484° E. Satellite imagery reflects that the VIRGO was not at that location at that time.



*Feb. 12, 2022: The VIRGO was not located at its reported AIS location.*

44.     Instead, satellite imagery reflects that, on or around February 12, 2022, at approximately 03:16 UTC, the VIRGO was in fact taking position parallel to the SUEZ RAJAN to initiate the STS transfer.



*Feb. 12, 2022: The VIRGO was in fact mooring with the SUEZ RAJAN to commence an STS transfer.*

45.     On or about February 18, 2022, Person A instructed the captain and chief officer of

16

the SUEZ RAJAN to correct the oil record book by reporting the true quantities of oil loaded from both the BRILLIANCE and the VIRGO. Prior to correcting the oil record book, the captain provided a copy of the draft changes to Person A for review and approval. Once Person A reviewed and approved the changes, the captain instructed the chief officer to make the changes in the oil record book (reflecting the two separate STS operations).

46.    The individuals and entities involved conspired to make it appear that the SUEZ RAJAN received the oil, in its entirety, from the BRILLIANCE rather than primarily from the VIRGO, to obfuscate that it was overwhelmingly of Iranian origin. Specifically, the STS transfer with the BRILLIANCE in which the SUEZ RAJAN loaded just 4,000 barrels of oil, the SUEZ RAJAN's reported draft depth following the STS transfer with the BRILLIANCE that suggested the vessel was fully laden, the crossed out entry in the SUEZ RAJAN's log reporting that it had received approximately 979,935 barrels of crude oil from the BRILLIANCE when in fact it had received just approximately 4,000 barrels, and the VIRGO's false AIS reporting during the STS transfer with the SUEZ RAJAN all appear designed to conceal that virtually all of the crude oil originated from the VIRGO and previously, Kharg Oil Terminal.

*The Relevant Parties Failed to Obtain a License from OFAC to Transport Iranian Oil*

47.    OFAC, which is located in the District of Columbia, has reported that, prior to the initiation of the present investigation, no licenses were sought by the relevant entities related to the above-described U.S. financial transactions and STS of the Iranian-origin oil.

*Conclusion*

48.    This Statement of Offense is not intended to constitute a complete statement of all facts known by the parties but is a minimum statement of facts intended to provide the necessary factual predicate for the guilty plea. The limited purpose of this Statement of Offense is to

demonstrate that there exists a sufficient legal basis for Suez Rajan Limited's plea of guilty to the charged crime and Empire's and Suez Rajan Limited's stipulation and agreement to not dispute that the information in the Statement of Offense is true and accurate. Suez Rajan Limited and Empire admit, accept, and acknowledge that they are responsible for the acts of their officers, directors, employees, and agents as set in this Statement of Offense. This Statement of the Offense fairly and accurately summarizes and describes some of the defendants' actions and involvement in the offenses to which Suez Rajan Limited is pleading guilty.

Respectfully Submitted

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:

Stuart D. Allen
Rajbir Datta
Assistant United States Attorneys


MATTHEW G. OLSEN
ASSISTANT ATTORNEY GENERAL
NATIONAL SECURITY DIVISION

By:

Benjamin J. Hawk
Deputy Chief
Counterintelligence and Export Control Section

18

<u>DEFENDANT'S ACCEPTANCE</u>

I am authorized to act on behalf of Suez Rajan Limited in this matter.

As the authorized representative for Suez Rajan Limited, I have read every page of this Statement of Offense and have discussed it with the attorney for Suez Rajan Limited, Christopher Man. I fully understand this Statement of Offense and agree to it on behalf of Suez Rajan Limited without reservation. I do this voluntarily and of my own free will, intending for Suez Rajan Limited to be legally bound. No threats have been made to me or to Suez Rajan Limited, nor am I under the influence of anything that could impede my ability to understand this Statement of Offense fully. Suez Rajan Limited is pleading guilty because it is in fact guilty of the offense identified in the Plea Agreement.

Date: March 17, 2023          _____
                                 Apostolos Tourkantonis on behalf of Suez Rajan Limited
                                 Defendant

<u>ATTORNEY'S ACKNOWLEDGMENT</u>

I have read every page of this Statement of Offense and have reviewed it with my client, Suez Rajan Limited, fully. I concur in my client's desire to plead guilty as set forth in the Plea Agreement and this Statement of Offense. I concur in my client's desire to stipulate and not dispute that the information in the Statement of Offense is true and accurate. I concur with my client's decision to admit, accept, and acknowledge that they are responsible for the acts of their officers, directors, employees, and agents as set in the Statement of Offense.

Date: March 17, 2023          _____
                                 Christopher Man
                                 Attorney for Defendant

<u>DEFENDANT'S ACCEPTANCE</u>

I am authorized to act on behalf of Empire Navigation Inc. in this matter.

As the authorized representative for Empire Navigation Inc. I have read every page of this Statement of Offense and have discussed it with the attorney for Empire Navigation Inc., Christopher Man. I fully understand this Statement of Offense and agree to it on behalf of Empire Navigation Inc. without reservation. I do this voluntarily and of my own free will, intending for Empire Navigation Inc. to be legally bound. No threats have been made to me or to Empire Navigation Inc., nor am I under the influence of anything that could impede my ability to understand this Statement of Offense fully.

Date: March 17 2023

_____
Apostolos Tourkantonis on behalf of Empire Navigation Inc.
Defendant

<u>ATTORNEY'S ACKNOWLEDGMENT</u>

I have read every page of this Statement of Offense and have reviewed it with my client, Empire Navigation Inc., fully. I concur in my client's desire to stipulate and not dispute that the information in the Statement of Offense is true and accurate. I concur with my client's decision to admit, accept, and acknowledge that they are responsible for the acts of their officers, directors, employees, and agents as set in the Statement of Offense.

Date: March 17, 2023

_____
Christopher Man
Attorney for Defendant